Repros Therapeutics v. Fisch Dr. Harry Fisch should have been made a co-inventor of Claim 1 of Repros' 185 patent and claimed Mr. Dr. Fisch name himself as the common inventor during the first re-exam rather than Dr. or by Joseph Pawlowski? The first re-examination had to do with Dr. Fisch's patent, not any Repros' patents or patent applications. That was a proceeding to determine patentability of Dr. Fisch's patent that matured from his provisional application. That proceeding, he couldn't have made any claim for co-inventorship in a re-examination proceeding. He affirmed that the named inventor of the 360 patent in April 2005 was Joseph Pawlowski? Well, what he did, Your Honor, was state that that application has Mr. Pawlowski listed as the him being the sole inventor and he didn't disclaim any inventorship rights. He was just, it's like taking a prior art reference and saying it's the Smith reference. Yes, sir. I want to understand the extent to which your argument relies on or depends on actual some degree of collaboration between the parties to a joint inventorship claim. So, suppose that the facts were identical to the facts of this case, except there was never a dinner meeting between Dr. Fisch and the named inventors and there was never, Dr. Fisch had never actually handed a copy of his provisional application to them. But rather, let's say they had come by the provisional application without the participation of Dr. Fisch. Let's say a disloyal employee of Dr. Fisch's had handed them the provisional application. Would he be a joint inventor under those facts? Your Honor, I think the result would be the same and I'll tell you why. The Eli Lilly case that we cite in our brief, which cites the Kimberly-Clark case, that case indicates that joint behavior and collaboration can occur where one co-inventor builds upon the report of someone else, even though the two inventors never worked together at all. So, if the named inventors had actually gotten started on their whole process by finding, let's say, an unpublished Ph.D. thesis somewhere that didn't constitute prior art but nonetheless had got them going, that person that wrote the unpublished Ph.D. thesis would be a co-inventor? I think the result would be the same, but here we have more than that. I wonder if that's consistent with our inventorship law that the Ph.D. thesis writer would become a joint inventor, but I take your position that that's your position. And I think, Your Honor, it's consistent with the inventorship law of this circuit, which indicates that the two joint inventors don't have to work together at all. Okay. The contribution that Dr. Fish made... Doesn't the word collaboration simply require they know that they're working together, though? I don't think they have to know that they're working together. They can be in two different facilities in the same company or different companies. I don't think collaboration has been construed by this court as actually working together in the context that you just described, Your Honor. But in this case, we do have... What is the nature of Mr. Fish's invention? Because I understand that both parties have stipulated that what was disclosed to Mr. Podolowski at that meeting was the provisional application, basically, that that is the nature of Mr. Fish's communication to Reprose that disclosed in that provisional application. It's a method of treating symptoms relating to testosterone deficiency in men with a pharmaceutically effective dosage of clomiphene citrate comprised of 50% to 70% trans-clomiphene isomer. Okay. So he directed or maybe has earned the right to patent coverage on 50% to 70%. But the claim at issue, Reprose's claim, is to consisting essentially of, which is trans-clomiphene, which is defined in the spec as 71 to 100%. So these are not overlapping percentages. So why is it... Reprose may well have gotten the idea from him to, hey, take a look at... I'm probably saying all these words wrong, but clomiphene. Take a look at clomiphene. I know the literature may suggest there are problems with side effects in using it to treat low testosterone problems in men. However, I've had some success in the, in his invention, in the 51% to 70% range. Is that what you said? Or is it 50% to 70%? I don't remember what you said. 50% to 70%. 50% to 70%. But then Reprose came along and after some of their own effort realized that there was an invention to be had in the 71 to 100% range. Well, that is outside of the way you just characterized Mr. Fish's invention. So why is he co-inventor on their patent? Because I think what you're saying, Your Honor, goes to the issue of whether Mr. Fish would be a sole inventor, and he's not. I think you have to look at the inventive process as a continuum. He has to have contributed to at least one element of one claim to be a co-inventor. So if their claim is to 71 to 100%, how does that not completely exclude what he invented? Because you have to look at how they got there. And how they got there was they filed a provisional application that incorporated Dr. Fish's invention. And they said our preferred embodiment is above 50%. And then their disclosure perhaps incorporated Dr. Fish's invention, but not their claims. And why isn't this completely identical to every improvement patent that exists? I invent a bicycle, which includes a chain. I have a patent on a bicycle. You then invent a better chain to be used on bicycles. You claim a bicycle with the better chain. You're still going to be infringing my basic bicycle patent, but yours is an improvement. Just because I invented the bike doesn't mean I have a right to be listed as a co-inventor when the claim that is really to a better chain as used on a bike. I think it's different, Your Honor, because in your hypothetical, you're comparing a patent to an improvement patent. Here we have a confidential application that was given to repros before they had any experience in this field at all. And it disclosed a concrete solution to a concrete problem, treating symptoms relating to testosterone efficiency with clomiphene citrate. But that's already in the prior art, and that's exactly why the examiner rejected the original claims of Dr. Fish. There's no doubt, based on this record, that what's already in the prior art is treating low testosterone using clomiphene. No, symptoms relating to low testosterone using clomiphene citrate with up to 70% of the trans isomers is not in the prior art because Dr. Fish went through two reexaminations and got claims to that. He got generic claims to a method of treating symptoms relating to testosterone deficiency with clomiphene citrate. And he even got claims 14 and 18 confirmed, which say where the clomiphene citrate is the trans isomer. Yes, he got those claims. And I have to be honest with you. I'm glad that I don't have to try to figure out the validity of those claims because it's very hard for me to understand. I'm not a scientist, and we don't have a full record, but what the examiner may have been thinking when he disallowed the claim he sought but then allowed the claim by adding the words to treat disorders related to. That didn't really substantially narrow the claim a lot. It was a very strange addition, but that's not the case in front of me. So he did get that claim, but he didn't get a claim to 71 to 100%. So I guess I don't understand. You could go after them for some sort of trade secret misappropriation if they breached a confidentiality agreement, maybe have a breach of contract action, but I don't understand why he gets to be co-inventor on what is effectively at best for your client an improvement patent. Because they use Dr. Fish's provisional as the foundation for their work. But that's what all improvement patents do. But they didn't use a public improvement patent to do it. They used a confidential provisional. But he then got claims on it. That's right. He got claims on it, but when you look at Repros' R&D efforts, you can't just take a snapshot in time to when they amended claims to add the words consisting essentially of. You have to look at the event of process from the beginning until the end. They had no experience in this field whatsoever. Is your position that the fact that the source of the inspiration or the beginning of the process was a piece of prior art, a published patent, disallows the patentee and the prior art patent from being a co-inventor? But if it had not been an actual prior art, that the inventor of the predecessor prior, non-prior art, would be a joint inventor? I hope I'm going to answer. Is that the distinction you're drawing? In other words, I'm trying to see if, to go back to my thesis writer, if that was an unpublished thesis, he's a co-inventor. But if he published the thesis, then he can't be a co-inventor. Is that your position? I hope I'm going to answer your question, Your Honor. I'm going to try very hard. To me, Dr. Fish giving this provisional to Repros was no different than Dr. Fish sitting in a room with them for days on end and explaining everything that was in the provisional. He was at the forefront of the inventive process. He was the foundation for them to even consider using clomiphene citrate or consider amounts of trans-clomiphene above 70%. It's a difference in degree and not in kind. That would be equally true whether he had actually published his article the day before he met with them or the article was not published. Is that the distinction you're asking us to draw? I think the distinction is that this was something confidential that was not in the prior art. It was not some patent that they did a patent search on and got, and then they tried to design around it or patent around it. I still don't understand, though, and your answers to Judge Bryson's question keeps reminding me that I don't understand. What did Dr. Fish convey to them vis-a-vis this provisional application that wasn't already in the prior art? Because you're wrong. I mean, clomiphene citrate was already in the prior art. Your response to Judge Bryson didn't include the 50 to 70% limitation when you responded. It should have. Okay. It should have. Because you admit clomiphene citrate and using it to treat low testosterone was already in the prior art. Right, but we're not talking about treating low testosterone. That's claim one of the 360. This is treating symptoms relating to low testosterone or androgen deficiency. Well, one of the two patents, that's not the case. One of the two patents, claim one, does not relate to treating symptoms, right? Let's see. Claim seven of the 360 says a method for treating secondary hypogonadism in a human male. That's not about symptoms. That's about the low testosterone overall. No, it's not, Your Honor. It's about symptoms because you have to look at the agreed upon claim construction of the term treating secondary hypogonadism in a human male, which is, and I'll quote it so I don't get it wrong, therapeutic or prophylactic management of a human male with low testosterone levels, the human male being with or without at least one related symptom. And that last part is... With or without. Right, but... Sorry. But, Your Honor, that last part is important because of the words therapeutic or prophylactic management, which is part of the claim construction. In the repro's patents, in the 360 patent, in the summary of the invention, the patent says the present invention is directed to, and one of the things it's directed to is ameliorating or preventing the symptoms of low testosterone. That's one of the inventive aspects of it, and that's right within that claim construction. Therapeutic, which is part of the construction, is ameliorating. Prophylactic, which is part of the construction, is preventing, and that has to do with symptoms, and that's why the end of the construction, which says with or without the disjunctive, at least one related symptom, makes sense because of the terms therapeutic or prophylactic. I thought that the definition, by definition, clomiphene citrate is 50 to 70 percent trans-clomiphene, isn't it? By definition, I think the Clomid commercial product at the time that Dr. Fish gave that patent application, it's comprised of clomiphene citrate. These are not product claims, though. No, no, I understand. What I'm trying, you said, well, what he added was, that you responded to Judge Moore saying that, well, clomiphene citrate was known in the prior art, but what he added was the 50 to 70 percent. I thought that the 50 to 70 percent comes along with clomiphene citrate. I think it comes along with clomiphene citrate. However, I think where we kept going back and forth was what was not in the prior art and what Dr. Fish was able to patent is a new method of using a pharmaceutically effective dosage of clomiphene citrate comprised of 50 to 70 percent of the trans-isomer to treat the symptoms of low testosterone. That was not in the prior art. Your Honor, I'd like to address, well, I see I'm running out of time. I had 11 minutes. I'll reserve the rest. Yeah, I think that we should reserve the rest for rebuttal and I'll go ahead and hear from Ms. Hull. May it please the Court. Although co-inventorship cases can involve difficult line drawing problems, this case is not one of them. The evidence of contribution and collaboration in this case is far weaker than evidence deemed insufficient by this Court in Eli Lilly, Hess, and Burroughs Welcome. A ruling in Dr. Fish's favor in this case would effectively overrule those cases, lower the high bar this Court has set for overcoming the presumption that the named inventors are the named inventors by clear and convincing evidence, and encourage putative co-inventors to wait in the weeds while others take risks and make investments only to later when the patents appear to be lucrative. The judgment should therefore be affirmed for three primary reasons. First, as Judge Moore's questioning, I think, got at, Fish contributed at most what was already well known in the prior art, the description of a commercially available product, Clomid, copied and pasted in the provisional from its FDA approved label. But this Court has repeatedly held that contributing what is already known is not a contribution to conception as a matter of law. Second, the contribution falls well short of this Court's demanding legal standard for a contribution to conception because nothing in the Fish provisional, which my friend just clarified, is the only alleged contribution at issue here. Nothing in it suggests the invention of repros, which is using the isolated trans-isomer. In other words, a composition consisting essentially of trans-isomer, which means it should not and cannot contain any significant amount of the cis, which again, as I just heard my friend say, still leaves, under their best case, the 50 to 70 percent trans-isomer still leaves you with 30 to 50 percent of the cis, and that falls far short of this Court's standard. Do you think that 30 percent cis-isomer would be a substance that consists essentially of trans-isomer? I think the phrase consisting essentially means it cannot contain any significant amount. Well, I guess I'm asking the question, do you think 30 percent is a significant portion? I would say 30 percent is certainly a significant portion. So if I came in with a product that was 30 percent cis or 25 percent, let's say, cis-isomer, that it wouldn't infringe your patent. Your Honor, the record doesn't disclose, and I'm not prepared to say exactly where that line is. I think what we can say is the facts in this case are under best case, it leaves 30 to 50 percent of the cis, whereas the claim language, which is the key here, consisting essentially of the trans, which means you're wanting as little of the cis as possible because the cis acts as a drag on the trans and has toxic side effects to boot, if that responds to your question. And if I may, Judge Bryson, picking up on your hypothetical involving the PhD candidate, I respectfully disagree with my friend, because I think this Court does require collaboration. This Court has said you don't have to be physically in the same place, and you certainly don't have to contribute to the conception of the entire, and that is all of the claims. But there certainly has to be collaboration, and there certainly has to be a contribution to the conception of the invention. Well, suppose, and I know that this is not at least objectively viewed, the fact of this case, but suppose that everything were the same except the dinner meeting at which, is it Dr. Fish or Mr. Fish? I've lost track. It's Dr. Fish. Okay, Dr. Fish, which Dr. Fish had conveyed his provisional application and presumably discussed it. Suppose he had said, you know, what's interesting about this climate is that it has this unusual disparity between the two stereoisomers. It has more trans than cis, which is unusual in chemistry. You'd expect them to be, I guess, pretty much 50-50. He said, that's an interesting line to pursue, and that had been it. Do you think that that would have been enough to trigger joint inventorship? It's basically put them on the trail of something which ended up with essentially consisting, essentially, of trans-cis. Well, that's certainly a closer case than ours, but I go back to this Court's decision. I know it's closer. Yes, I go back to this Court's decision in Eli Lilly, and in Eli Lilly, you had the patent holder say to the company, hey, have you considered aerosolizing our product, Lispro? They went back. They did it. This Court held that wasn't sufficient as a matter of law because it looked very closely and carefully at the claim, and what the claim said was that the aerosolizing, the Lispro, increased the bioavailability of human insulin by twice as much, and this Court said, no, it's not enough. It's not enough just to make a suggestion or a recommendation. I think Hess is another example that shows where the line is that this Court has drawn. There, the named inventors went to the co-inventor, putative co-inventor, and said, look, we're trying to come up with a balloon, an angioplasty catheter that works. We're hung up on material, and they said, well, the putative co-inventor said, well, try our product. Try our material. Made other suggestions. The named inventors took some suggestions, rejected others, and even so, this Court said that was not sufficient, so I think this Court precisely to ensure that inventors don't wait in the seats, this Court has just drawn a very clear line in terms of conception and collaboration, and so, of course, I think your case is closer. I think under this Court's cases, I think it's arguable that even under those facts, you would not have co-inventorship. You might have a better case on collaboration, but I think co-inventorship in terms of contributing to the conception, the conception of the invention, which is what's key. Well, I guess I was trying to incorporate the notion of conception, at least in a general sense, with the suggestion that something important is going on here by increasing the percentage of the trans isomer. That would be maybe not as precise a conception as the ultimate consisting essentially of, but it certainly is. I would think if they were all working in the lab together, you would say this is part of the conception. I think perhaps, but again, what this Court has said, and it says requires a specific settled idea. I'm quoting from Burroughs Welcome 1228 here. A specific settled idea, a particular solution to the problem at hand. So I think when you look at it from that framework in terms of the conception, is there the quantum that this Court has required in terms of looking at the claims? To the extent that I think what Your Honor may also be getting at is the claim that we've heard, my friend has invoked a lot today, about a foundation or inspiration. I think those things are simply not enough by any stretch under this Court's cases to amount to the required quantum of conception, contribution, or collaboration. I think at most, Dr. Fisch's provisional inspired Mr. Podolsky and Wheely to pursue an oral testosterone therapy, but not by any stretch do you get to the use of the isolated trans isomer to address both the symptoms and also just the underlying condition, which are the two patents at issue here. So I suppose, although I know you don't want to commit your claim on this, but I suppose that your view would be that if Dr. Fisch had or has any remedy, it would be in a common law action for some form of tort or breach of contract based on the confidentiality agreement, but not through the patent law. Right. Again, we don't think he would have been successful, but yes, I think that might go to the alternative estoppel holding in this case as well, just in terms of that there were other remedies, breach of the agreement, trade secret theft, any number of other remedies that he could have pursued that he didn't. And again, the co-inventorship claim, we believe that the facts of this case, again, go far short. Your equitable estoppel claim, if anything, it would actually support the idea that he prejudiced himself by waiting, but not prejudiced you all in any way. No, Your Honor, I think- If he fell outside the creative statute of limitations for any of these common law actions, it's only he that's been disadvantaged. Right. Well, I think my point there is that it shows that there were any number of ways along the trajectory and the path here that he could, in other words, there were alternatives he could have made to signal, just give some signal to Reprose so that Reprose wasn't lulled into the belief that he would never at any point bring forth a claim to be co-inventor. So my apologies if I misspoke in terms of that's our defense and certainly not his claim. How was Reprose lulled into belief that he'd never bring a claim? Several, I think several answers to that question, Your Honor. I think the first answer is that he's correct that he never threatened to sue. But in my mind, what he did do was even more effective in lulling Reprose in that he actively encouraged, in an email he sent, he referred to the studies that were ongoing and said, well, it looks like maybe they'll be interesting. So not only was there not a threat to sue or some sense that he was going to make a claim to co-inventorship here, but there was an effective encouragement of Reprose going forward making investments. Why does encouraging someone to further build on your research lull you into believing he is therefore not going to pursue any claim against you? Doesn't, at the end of the day, it matter whether you seek a patent on that further research and doesn't it also matter whether he obtains patent rights himself that may be so broad, which I mean, he did initially seek quite broad patent rights. And so had he obtained the breadth of the rights he was originally seeking at the very outset, that may well have covered the whole gamut and anything you got later on would have been a typical improvement patent where you infringe the basic patent and then you infringe the improvement patent. So why, in light of all of that, does that make his, I mean, wouldn't anyone who thinks they came up with a solution to a medical issue want to encourage others to attempt to commercialize it and build upon it? He's not commercializing it himself, so why wouldn't he want to encourage someone else to commercialize it? And how in the world does that translate into, I'll never sue you? Certainly, and I think on the alternative estoppel holder, I would return to Judge Your Honor's questions initially about naming. So it's not just the encouragement here. There's the span of time, which as the district court held, is not, we're not talking about latches, but that is an indicator that can be considered under the misconduct, is the amount of time. It must first have been an affirmative act. That's the first thing. It's not just some passage of time. There has to be an affirmative act. Yes. What is the affirmative act? I think there are several. I think the email, encouraging, acknowledging in the studies. But you haven't answered my question then. Why does encouraging someone to commercialize your invention, because you'd like to see it commercialized, especially more in the medical field where it's going to help people, how does that translate into, and therefore, I won't sue you? Because that, together with the fact that he had his own filings before the PTO, that he named Mr. Podolsky as the named, named inventor. There was an awareness there. He wasn't named inventor. That's the way you communicate to the PTO. Certainly. In reference to a patent, you say the Podolsky patent. That doesn't mean that I concede that he's the proper inventor. Certainly. I agree, but I think it does show that in the fact of writing named inventor, I think that, again, shows there were other during that process to provoke an interference. Well, what you're really saying is that it's a combination of both the encouragement and silence. Yes, that's correct, Your Honor, and that this court... Silence is an action. Yes, in Aukerman, so that you don't just have silence here, but those things together, particularly from the standpoint of equity and it being an equitable doctrine, that we don't think the district court abused its discretion in looking at the events here and holding that they amount to... But again, this court, our contention is that this court doesn't need to reach the district court's alternative holding on estoppel, which would only apply to the 360 patent. It can resolve this case on both patents at issue, the 360 and the 185 on the inventorship issue and need not reach estoppel at all. What is the prejudice given that everyone agrees that the only thing he communicated was what's contained within his provisional application, which is a documented writing that is not changing? What was the prejudice that your client suffered by virtue of the passage of time such that equitable establishment? I think the prejudice that we suffered, and I see my red light is on, may I answer? Yes. There's both economic prejudice and evidentiary prejudice. The economic prejudice goes to the that we spent over the course of the years experimenting and developing our product, Androxol. I think the evidentiary prejudice lies not just in Dr. Fish's fading memory, but also in the fact that, and it's in the record that we... Why is his fading memory relevant? Well, because it is... That the main issue is what was communicated and that is documents. Yes, I think that does go to the documents, but there's another aspect, which is our own fading memories at Repros and documents that we could have produced to further confirm, in addition to the contemporaneous memo, talking about the isolation, the use of the isolated trans isomer that perhaps would have bolstered our claim that we were the ones who invented it, and that most of the provisional contributed what was well known in the art. Just one more question. What was the date of issuance of your patent? It was relatively recent, wasn't it? Let me... 2010. Yeah, that's right. Yes, I just wanted to get the address. Yes, 2000. Could he have brought an action before that for correction of inventorship? He could have brought an interference, if I understand the correct... Just correction of inventorship. Correction of inventorship? Yeah. I believe that he could have. Yes, but he definitely could have provoked an interference. I thought the rule was that you could only bring a correction of inventorship after the issuance of the patent. I'm sorry, Your Honor. I misunderstood. That's correct, but he could have provoked an interference proceeding. Okay. Thank you. My apologies. We went a bit over, so we will give you three minutes of rebuttal time, and that should even out the time. Thank you, Your Honor. I'll speak quickly. This is very different from the Hess case that counsel mentioned, and Hess had to do with an angioplasty invention where the unnamed inventor had no experience in angioplasty, and all he did was give the named inventor some general ideas and advice. Here, the situation is reversed. Repros had no experience in treating symptoms related to testosterone efficiency, and Dr. Fish gave them not just general ideas and advice, but a concrete solution to a concrete problem in the provisional. Now, when I first got a chance to speak with Your Honors, there was some discussion about symptoms versus raising testosterone, and the Repros 360 patent makes clear that treating symptoms is an important part of the invention, and I refer Your Honors to A. 1541, Summary of the Invention, beginning at line 31, and I'll quote, The present invention is directed to compositions useful for increasing testosterone levels in male mammals and for ameliorating or preventing the sequelae of low testosterone levels. Sequelae means symptoms, and in column 2, beginning at line 8, all of these symptoms are listed. They're the same symptoms. Yes, but at least Claim 7 of the 360, maybe not Claim 1 of the 185, but Claim 7 of the 360 doesn't go to symptoms. It goes to the condition itself. And the condition itself, because of the words treating, and they're agreed upon, claim construction includes symptoms. Otherwise, that was one of Repros' arguments that, well, Claim 1 and Claim 7 are really the same, but how could they be the same? They'd be redundant. Claim 1 says, Raising levels of low testosterone, which we're not claiming co-inventorship to, because we believe that's in the prior art. Claim 7 is treating secondary hypogonadism in a human male. And when you look at the difference in claim language, otherwise, the claims are identical. And when you look at the difference in claim language and apply the claim construction, Claim 7 does incorporate symptoms. And clearly, Claim 1 of the 185 does because it goes to the symptom of wasting. And I'll note, counsel said something about what constitutes essentially consisting of in terms of the amount of cis isomer. The specification of the 185 patent in all of the embodiments is very clear. The range is 71 to 100 trans. That's one uptick. Where would you say is the best reference for that? Okay. This is A, 1556. It's a summary of the invention of the 182. And you can read all of Column 4 and you can read all of Column 5 up until the brief description of the drawings. Every reference is to 71 to 100. Which patent are you looking at? The 185. These are appendix sites 1556 and 1557. Now, what Dr. Fish gave them was the knowledge of a method that worked using clomiphane citrate in the first place, which they had no knowledge of. And not to treat symptoms relating to testosterone deficiency was not in the prior art, Your Honor. Or else Dr. Fish wouldn't have gotten his 920 patent with all those claims talking about using clomiphane citrate. It wouldn't have been the first invalid patent to go through the, successfully go through the patent office. So the fact that he got the patent is certainly not dispositive as to whether he's really invented anything. But that's the evidence in this case, Your Honor. And the district court made plain it was not her job to determine the validity or the infringement of Dr. Fish's 920 patent. Yeah. Okay. Thank you. Okay. Thank you, Your Honor. The case is taken under submission.